Patricia J. MCLAUGHLIN

v.

THE PRUDENTIAL LIFE INSURANCE COMPANY OF AMERICA

No. CIV.A. 01CV11585–RGS.

United States District Court, D. Massachusetts.

May 25, 2004.

Charles E. Berg, Law Office Of Albert E. Grady, Brockton, MA, for Patricia J. McLaughlin, Plaintiff.

Carey Louise Bertrand, Wilson, Elser, Moskowitz, Edelman & Dicker, Boston, MA, for The Prudential Insurance Company of America, Defendant.

William T. Bogaert, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Boston, MA, for The Prudential Insurance Company of America, Defendant.

Edward P. O'Leary, Fitzhugh, Parker & Alvaro LLP, Boston, MA, for The Prudential Insurance Company of America, Defendant.

### MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On August 14, 2001, Patricia McLaughlin filed this Complaint in Plymouth Superior Court against her employer's disability insurance provider, The Prudential Life Insurance Company of America (Prudential), challenging Prudential's denial of her claim for long-term disability benefits. The case was removed by Prudential to the federal district court, where the parties proceeded to assemble the record.[1] On April 10, 2002, cross-motions for summary judgment were filed. On September 12, 2002, the court heard oral argument. During the hearing, it became evident that the plan administrator had not considered an August 21, 1999 letter from McLaughlin's treating physician, Dr. Stephen Johnson, opining as to the gravity of McLaughlin's disability. The court consequentially remanded the case to Prudential for reevaluation. After a further review, Pru-

---

1. There was a dispute as to the inclusion of two documents. On January 18, 2002, the court entered an order observing that:

 [p]laintiff and defendant each object to the inclusion of a single document in the assembled record. Plaintiff's objection to the inclusion of the so-called "SOAP notes" on the ground that the qualifications of the author are not evident from the face of the document misses the point. The issue is whether the notes formed part of the record upon which the claims administrator made the final claim decision. It is undisputed that they were. I am also satisfied that the plaintiff has made a sufficient showing that she mailed Dr. [Stephen H.] Johnson's August 21, 1999 letter to the Administrator, and therefore it was presumptively received. The objections to both documents are *OVERRULED*.

dential again denied McLaughlin's claim. The parties thereafter filed supplemental briefs, and the court heard further oral argument on March 5, 2004.

## FACTS

The undisputed facts are these. On December 21, 1981, McLaughlin began working for the State Street Bank and Trust Company (State Street) as an Account Manager. McLaughlin was enrolled in State Street's Long–Term Disability Plan (Plan).[2] Prudential is both the insurer and administrator of the Plan.

On September 11, 1998, McLaughlin left State Street on short-term disability leave after experiencing back pain and weakness in her lower extremities. She was diagnosed with an intradural thoracic tumor at T6/T7 of her spinal cord. Dr. Johnson, McLaughlin's treating physician, recommended surgery. On November 18, 1998, Dr. Johnson performed a thoracic laminectomy and gross total resection at South Shore Hospital. On November 24, 1998, he discharged McLaughlin from the hospital after noting "an overall improvement in her strength and sensation in her lower extremities."

On December 17, 1998, McLaughlin saw Dr. Johnson for a post-surgical examination. According to his notes of the visit:

[s]he has done quite nicely. She is starting to regain her strength. Her myelopathy is resolving. She is no longer in a wheelchair and is able to walk comfortably with a four-point walker. At home she walks on her own. On examination today, her strength in her iliopsoas is good. She has no deficits in her extensor hallucis longus. Sensory examination is intact. She no longer has clonus at the ankles, and her toes are

down-going. I am encouraged by her recovery and look forward to her regaining more strength and momentum as time goes on. I have given her a prescription for physical therapy . . . .

On Dr. Johnson's recommendation, McLaughlin began physical therapy at the HealthSouth Sports Medicine and Rehabilitation Center. The December 28, 1998, therapy notes indicate that McLaughlin reported "trouble strengthening knees . . . [but] no longer dragging at foot. . . . Toothache sensation at incision and somewhat in knees." Subsequent physical therapy notes tracked her range of motion and reported "slow but steady gains."

On February 23, 1999, Dr. Johnson saw McLaughlin. His notes indicate that:

[s]he is doing well. She has gone from a wheelchair to walking unassisted although she did come to the visit with a cane today. She had a number of questions that I addressed with her. One is, that she has recurrent swelling of her feet and ankles and I think that is probably on the basis that is not related to her spine. I have recommended that she speak to [another doctor] concerning the possibility of using a diuretic. . . . [S]he has noticed that she has had some urinary leakage from time-to time. . . . She has a burning pain in her right foot and another sensation at the bottom of her left foot that can be troubling and I suspect that those are due to reinnervation phenomena that should also improve with time. I would like her to get into additional physical therapy time, now more prompted towards strengthening and gait analysis and an aggressive rehabilitation program.

Upon the termination of her short-term disability insurance, McLaughlin applied to

2. The full name of the Plan is the State Street Bank and Trust Company Weekly Disability Coverage and Long Term Disability Coverage Plan.

Prudential for long-term disability benefits. On April 12, 1999, she was discharged from physical therapy after reaching her insurance limits. The discharge report recommended that she "continue a fitness plan at a clinic." The report also noted a "[g]reatly improved gait" and encouraged her to work "to improve towards endurance goal." On March 15, 1999, McLaughlin was temporarily granted long-term disability benefits while Prudential investigated her claim.

On June 3, 1999, Dr. Johnson saw McLaughlin again. According to his notes of the visit:

[McLaughlin] continues to show marked improvement. She has had some weight loss. She has been through physical therapy. She has marked improved strength in her lower extremities. In fact, on exam today, she has normal strength both proximally and distally. She is certainly walking without any aides. She has some continued problems with ankle edema but she is on a diuretic and that has improved since her prior visit. Her sensation is intact to pinprick and light touch. Her deep tendon reflexes are normal-active. There is no clonus.

Dr. Johnson concluded by recommending that McLaughlin undergo an MRI in December and return for a follow-up visit in January. "Until that time, she is to continue her activity level as tolerated without restriction."

On June 8, 1999, Prudential denied McLaughlin's request for long-term benefits, stating:

[a]ccording to our records you became disabled on September 11, 1998 due to a Thoracic tumor. Since the time of the removal of your tumor, October 18, 1999, you have been treated by Dr. Stephen H. Johnson and have attended physical therapy at HealthSouth Sports Medicine and Rehabilitation Center. You have been discharged from physical therapy as of April 12, 1999.

As per your February 8, 1999 physical therapy progress note your functional assessment revealed that your sitting tolerance is 50%–75% of the time, Lifting light objects up to 10 pounds is 75%–100% of the time and you can climb stairs 25%–50% of the time. In addition, your records indicate that you had progressed to a level of strength that was measured in the range of 4/5 (5/5 range). Furthermore, your records from Dr. Geller's office dated September 29, 1998, indicated that you were at a level of 4/5 prior to surgery. Therefore your level of strength has increased to your baseline point at which you were performing your own occupation as an Account Manager at State Street Bank & Trust Co[.] prior to surgery.

In addition to your February 8, 1998, progress note we also reviewed your physical therapy discharge summary dated April 12, 1999. In this discharge summary you are evaluated as having greatly improved gait, range of motion within normal limits and functional activity inventory within normal limits, however with poor endurance.

We have also taken into consideration the description of your position received from your employer. As an Account Manager at State Street Bank & Trust Co., the duties of your occupation are sedentary in nature and you are able to stand and move about on your own will.

After a thorough review of the above information, we have reviewed no objective medical evidence in our file that would suggest you are unable to perform the duties of your own occupation. Therefore, we have issued benefits through . . . June 30, 1999, as a measure

of assistance and have terminated your benefits effective July 1, 1999.

You have the right to appeal our decision. If you elect to do so, the appeal must be in writing . . . .

On June 21, 1999, McLaughlin appealed the termination. Prudential then requested a follow-up report from Dr. Johnson. On August 1, 1999, Dr. Johnson submitted the following note.

The above patient is under my care. On 11/18/98 she underwent a thoracic laminectomy, T6, T7 and partial T5 and removal of an epidermoid tumor.

Although she has shown improvement, it is my professional opinion that Ms. Patricia McLaughlin is totally and permanently disabled for any and all occupational activities.

On August 10, 1999, Prudential again denied McLaughlin's claim stating, in relevant part:

[w]e received your request for appeal of our decision on June 28, 1999. Your letter stated that you remain under the care of Dr. Johnson and that it is Dr. Johnson's conclusion that you are unable [to] perform the physical requirements of your job. As part of our evaluation of your request for appeal, we obtained Dr. Johnson's records to determine the extent of your impairment. Dr. Johnson's records document your recovery following surgery.

You were seen in follow up on December 17, 1998, at which time Dr. Johnson documents that you were starting to regain your strength and myelopathy is [sic] resolving. On examination, your strength in your iliopsoas was good with no deficits in your extensor hallucis longus. Sensory examination was intact and there was no clonus at your ankles. You returned to the office on February 23, 1999 at which time Dr. Johnson noted symptoms which included swelling in your feet and ankles, urinary leakage from time to time and pain in your feet. You were last seen on June 3, 1999. This visit documents that you continue to show marked improvement with marked improved strength in your lower extremities. On examination, Dr. Johnson documented normal strength both proximally and distally, walking without any aids. Your problems with ankle edema was improved since your prior visit. Sensation was intact to pinprick and light touch and deep tendon reflexes were normal. Dr. Johnson suggested a repeat MRI in December and return visit to the office in January, 2000.

Based on Dr. Johnson's findings, you have recovered from your surgery with no residual deficits in function documented on exam. We attempted to contact Dr. Johnson telephonically to determine why he felt you need to remain out of work. However, Dr. Johnson was not available via telephone. Instead, he prepared a brief statement which indicates that it is his opinion that you are totally and permanently disabled as a result of your November, 1998 surgery. A review of his office notes do not document any impairment or resulting disability which would prevent you from working. Although you report a low tolerance for sitting and difficulty with stair climbing, there is no evidence in the medical record that you continue to have functional impairments. Your occupation is one that allows you the ability to move about at will and would not require long periods of sitting without a break. In the absence of any objective documentation to support an impairment preventing you from working, we have upheld our decision to terminate your claim for Long Term Disability benefits.

You may again appeal this decision . . . .

On August 21, 1999, Dr. Johnson sent Prudential the following letter.

At issue is whether Patricia McLaughlin is regarded as totally disabled. In my opinion, Patricia McLaughlin is totally disabled. The following reasoning applies. She is now nine months status post resection of a tumor in the thoracic region of the spinal cord. When she presented with that tumor she was markedly debilitated and weak particularly in her lower extremities. After surgery she improved markedly, regaining much of her strength and sensation. Radiographically, she has had complete resolution of her tumor. However, there were satellite lesions at the time of surgery and, at any time, those could decide to become significant growths.

Although her strength has returned to normal or near normal as best I can tell, she still has significant problems associated with the tumor and the subsequent surgery. She has moderate chronic back pain and easy fatigability. She had a bladder disturbance which is likely permanent and results in urinary urgency, frequency and spasm. She [sic] altered subjective sensation and mild proprioceptive abnormalities that are not easily picked up on an objective examination. Finally, she has troublesome ankle edema that worsens with ambulation or upright position that is likely due to a change in her venous outflow related to her long-term lower extremity paresis. This is not a work related injury but is a condition that may have recurrences and results in a significant disability that, although improved, is potentially ongoing and can be exacerbated.

It is my opinion that it would be proper to deem her totally disabled and to compensate her for that loss of income. If there are further questions, please do not hesitate to contact me.

On February 3, 2000 Dr. Johnson saw McLaughlin to determine whether any tumor re-seeding had occurred. He reported that the tumor had not reappeared, but that she was "still struggling with the disability issue and I still support her in her quest for that."

On May 22, 2000, McLaughlin was examined by Dr. Barbara Stelle of the Massachusetts Rehabilitation Commission Disability Determination Services. Dr. Stelle reported that McLaughlin

brings with her today a postoperative MRI to evaluate for any feeding of the epidural tumor, and there is noted signal change within the core at the T4–T7 level consistent with myelomalacia and epidural granulation tissue in the right, as well as a T6 anterior disc having contact with the cord.

The patient continues to have difficulties at home. She feels diffusely weak in the legs, has to take frequent naps and rest, the thoracic area posteriorly becomes numb, and, at times, there is a feeling of chest weakness. The patient does continue physical therapy that she has to pay for herself as her insurance has discontinued coverage. She feels this is helping. She does require help at home with laundry, cleaning, cooking, and shopping. She is able to sleep well and takes 800mg of ibuprofen, usually a couple of times a day for the pain.

On examination, Dr. Stelle found that McLaughlin's "thoracic spine was diffusely tender," but that she had a "full range of motion of the arms and shoulders." After a sensory examination, she found that "there was a decrease to light touch and pinprick in band-like dermatomes on the right and left at the T5–T7 level. The gait was somewhat spastic but stable." Dr. Stelle also noted that "on neurologic examination and mental status, the patient admitted to some depression over financial

demise, continued pain, and inability to care for her family in the manner she was accustomed." Dr. Stelle concluded that McLaughlin "has findings both on imaging and on physical examination consistent with a thoracic myelopathy. She would likely poorly tolerate long-term sitting, bending, or lifting."

On December 5, 2000, McLaughlin returned to see Dr. Johnson. His notes of the visit indicate that McLaughlin complained of a burning and pulling sensation in her back, which he attributed to an injury that McLaughlin had suffered in a July 2000 motor vehicle accident. He concluded that McLaughlin's

> impairment is secondary to spasticity brought on by her original myelopathy. It is unlikely to improve in the foreseeable future and I fear that many of her symptoms are related to the abnormal sensory function associated with her previous spinal cord injury. Having said that, I think we have reached a plateau at what we can do for her medically, that is of course unless she develops more profound spasticity and treatment for that would be pharmaceutical.

On December 19, 2000, McLaughlin was found eligible for Social Security disability benefits.[3] An Administrative Law Judge (ALJ) concluded that McLaughlin was disabled since September 11, 1998, by a severe impairment described by the ALJ as "status post excision of spinal tumor, chronic back pain, fatigue, bladder problems, [and] ankle and leg edema." Citing Dr. Johnson's August 21, 1999, letter and Dr. Stelle's evaluation, the ALJ found that McLaughlin "had a tumor excised from her spine, and she continues to have evidence of a thoracic disc compressing her spinal cord. The claimant has significant findings of neurological deficits in her lower extremities and chronic pain in her back and legs. The claimant has undergone aggressive treatment with surgery and post-operative therapy, but has failed to achieve significant relief of her disabling symptoms." The ALJ also referred to Dr. Stelle's notation that McLaughlin had reported "that she was feeling depressed in connection with her continued pain and financial stress" and that she "had been treated with medication for anxiety and panic attacks."

On May 1, 2001, McLaughlin requested that Prudential reconsider its denial of her claim.[4] In response, Prudential requested that McLaughlin complete a Comprehensive Claimant Statement. In so doing, McLaughlin stated that she suffered from leg weakness, numbness, edema, and fatigue, and had trouble sitting, standing, lifting, or bending for any extended period of time. On June 26, 2001, Prudential denied McLaughlin's claim for a third time. For some reason, Dr. Johnson's August 21, 1999 letter had not made its way into the record. In denying McLaughlin's claim, Prudential stated that:

> [t]he medical evidence in file indicates you had a thoracic laminectomy and gross total resection on November 18, 1998. You were seen in follow up on December 17, 1998 by Dr. Johnson. At that time, Dr. Johnson documented you were starting to regain your strength

---

**3.** While a disability finding by the Social Security Administration is of no controlling weight in a plan administrator's determination, *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000), *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), Prudential's Medical Director quoted selectively from the ALJ's decision in his final assessment of McLaughlin's claim.

**4.** McLaughlin also notified Prudential that she had been determined eligible for Social Security disability benefits.

and the myelopathy was resolving. In your next office visit on February 23, 1999, Dr. Johnson notes symptoms including swelling in the feet and ankles, occasional urinary leakage and pain in your feet. On June 3, 1999, the medical information documents improved strength in the lower extremities. On physical examination there was normal strength both proximally and distally, and you were walking without assistive devices. The problems with ankle edema were improved since your previous visit, sensation was intact to pinprick and light touch and deep tendon reflex were normal. A repeat MRI was recommended for December and you were to be seen again in January, 2000. Dr. Johnson opined you should continue your activity level as tolerated without restriction.

In the Massachusetts Rehabilitation Commission Disability Determination report dated May 22, 2000, the motor examination showed slightly decreased tone in[ ] the legs. There was normal bulk and muscle strength testing was 5/5 throughout with some give away weakness after repetitive strength testing in hip flexors and abductors. Your gait was somewhat spastic but stable. The report goes on to state you would likely poorly tolerate long-term sitting, bending or lifting.

You were seen by Dr. Johnson on December 5, 2000. You report a burning and pulling sensation in your back. Dr. Johnson indicates you have been less active due to pain since a motor vehicle accident in July, 2000. You report numbness and tingling in your feet and pain when walking. There was mild spasticity on examination. Sensory examination revealed decrease sensation to pinprick and light touch in the medial aspect of the left foot. There was no motor disturbance noted.

Based on the medical evidence, you have recovered from your surgery with no deficits documented on physical examination. Dr. Johnson has stated you are unable to return to work, however there has been nothing provided to document your inability to perform your job. You report difficulty with prolonged sitting and walking, however there is no medical documentation to support a functional impairment. Furthermore, your job allows the ability to change positions as needed and there is no prolonged periods of sitting required. Therefore, in the absence of medical documentation to support an impairment which prevent you from working, we have upheld our previous decision to terminate your LTD benefits.

After the September 14, 2002 hearing, the court remanded the case to Prudential for consideration of Dr. Johnson's August 21, 1999 letter. Prudential again denied McLaughlin's claim after a review by its Medical Director. The Medical Director's report characterized McLaughlin as a "43 year old, female, financial administrator who has claimed work disability due to the impact of back surgery [for the] remov[al] of a benign spinal tumor. Her records reveal that she has also had a history of anxiety with panic attacks preceding her back problems." The report continued:

[i]t appears that Social Security Disability Benefits were approved on the basis of her history of psychiatric complaints and an opinion from Dr. Stelle that she may not tolerate long-term sitting.

● October 2, 1998—the initial neurosurgical assessment by Dr. Johnson. Following MRI confirmation of a mass displacing spinal cord at T6/T7, Dr. Johnson diagnosed a myelopathy secondary to this local T6/T7 thoracic tumor. Positive Sx included left leg

weakness associated [with] Babinski reflex and clonus.[5]

• The discharge summary for her hospitalization and surgery November 18, 1998 post-laminectomy to remove this benign epidermoid tumor described early progress with improvement in strength and sensation in her lower extremities at discharge.

Evidence of continuing progress in the ensuing 7 months:

• December 17, 1998—"has done quite nicely . . . starting to regain her strength."

• February 23, 1999—"doing well . . . pleased with her progress."

• June 3, 1999—"continues to show marked improvement . . . normal strength both proximally and distally (in the LE's)." Normal tendon reflexes were present and her previous clonus had vanished. In fact, she was supported for unrestricted activity as tolerated by that point.

• Nevertheless, without explanation and despite the documented progress post surgery, Dr. Johnson provided an[ ] advocacy note for Total Disability on the basis of her reported continuing Sx?

• By December 5, 2000 with now, a cryptic reference to an MVA back in July [2000], she is being described as hypereflexic, experiencing abnormal back sensations and parenthesis in her feet.

• By July 19, 2002 her MRI is described as "generally normal" noting the presence of evidence of her surgery and some degree of degenerative osteoarthritis but no nerve root or cord compression. Her diagnosis has become chronic back pain (not described as severe) noting no evidence of radiculopathy. [E]g. "I needn't see her unless she develops frank radiculopathy or severe back pain neither of which she has" (where then, is the evidence for total and continuing loss of all work capacity?).

Analysis/Discussion: .

We have a 43 year old, former financial administrator who has claimed work disability since September 11, 1998 following the identification of a spinal canal mass impinging on her spinal cord at T6/T7 which had lead [sic] to significant neurological findings including left leg weakness in the presence of a Babinski reflex and Clonus. However, the claimant underwent successful surgical decompression laminectomy November 18, 1998 with removal of a benig[n] epidermoid tumor. Immediate and progressive improvement in her strength and symptoms were noted for over 7 months.

Specifically, the post-op surgical records of Dr. Johnson outline steady and unbroken progress with no evidence of setbacks, complications or other problems. Despite the records, Dr. Johnson provided an advocacy note for total disability?

Cryptically, his December 5, 2000 evaluation alluded to an apparent motor vehicle accident back in July 1999[sic] for which we have no information or clinical records describing any specific problems, exacerbations or new injuries? It would be helpful to know, for example, if there is litigation arising out of this vague event since the assessment/interpretation of, in particular, self-reported pain and sensory Sx can be impacted by the circumstance of unresolved litigation. Also, the claimant has been noted to have had a history of anxiety and panic disorder before the demonstration of her documented back problems and

---

5. The court believes that "Sx" is an abbreviation for "symptoms."

she has apparently continued treatment for this since that time.

The Social Security Disability benefits acceptance appears to have been based at least in part on this psychiatric history yet we have no records of the nature or severity of these diagnoses or the potential impact on this claimant's perception of her Sx and circumstance as a result of them. It is well-recognized that the perception and interpretation of pain and other Sx are significantly impacted by the presence of Anxiety/Depression Disorders.

My assessment of the records available concludes that this claimant has made a substantial and successful recovery from a significant diagnosis of spinal tumor requiring surgery. She has been left with what appears to be a stable, residual, complaint of parenthesis in her back and feet based on her self-report of these Sx.

The functionality question is whether these Sx fundamentally and reasonably represent an insurmountable obstacle to return to work? While it may be both true and reasonable that this claimant not be expected to sit for extended periods of time without postural change or to engage in awkward positioning or heavy lifting, there is simply no evidence presented to explain why a motivated claimant could not reasonably be able to resume sedentary to light work duties in the absence of evidence of radiculopathy or other deterioration in her post-op surgical status. Her own attending physician acknowledged that her back pain was not severe and there was no evidence of continuing radiculopathy, only presumed residual Sx which had shown dramatic and consistent improvement after surgery.

## DISCUSSION

*De novo* review is the default standard for the review of claims under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When plan administrators are granted such authority, an "arbitrary and capricious" standard of review applies. *See Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir.1997). The parties agree that the Plan unambiguously grants the plan administrator discretion to make benefits determinations and to construe the terms of the Plan.

■ McLaughlin, however, argues that a *de novo* standard of review should apply because Prudential, as the Plan insurer and administrator, has an inherent conflict of interest. The First Circuit has said that where a genuine conflict of interest exists, a review under the arbitrary and capricious standard should be given "more bite." *Doyle v. The Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir.1998). *Cf. Leahy v. Raytheon Co.*, 315 F.3d 11, 16 (1st Cir.2002) (an alleged conflict of interest must not be "chimerical, imagined, or conjectural"). The Court of Appeals, however, has declined to infer an actual conflict of interest from the mere fact that an entity acts both as the insurer and plan administrator, *Pari–Fasano*, 230 F.3d at 419, or has a generalized concern for preserving assets. *Doe v. Travelers Insurance. Co.*, 167 F.3d 53, 57 (1st Cir.1999). This is especially true when a plan is employee-funded. As Judge Selya observed in a case not unlike this one, where a similar allegation of a conflict of interest

was made against one of Prudential's competitors,

> market forces are at work. If MetLife denies claims that Plan participants as a group view as valid, those employees will be inclined to withdraw from the Plan, thus reducing MetLife's role (and, presumably, its compensation). By the same token, if MetLife awards benefits that are viewed as undeserved, Plan participants will experience an increase in their premiums and thus be inclined to withdraw from the Plan (again reducing MetLife's role and remuneration). Either way, the structure of the Plan furnishes an incentive for MetLife to be unbiased in its handling of claims. This is telling, for courts should not lightly presume that a plan administrator is willing to cut off its nose to spite its face.

*Leahy*, 315 F.3d at 16. What would be required to show a genuine conflict of interest is not explicitly defined by the case law, although one might suppose that it would include evidence that claims examiners were being pressured by company managers to deny benefits claims or were being offered incentives to do so.[6]

The Plan defines long-term disability as follows:

> Total Disability exists when Prudential determines that all of these conditions are met:
>
> (1) Due to Sickness or accidental injury, both of these are true:
>
>> (a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.
>>
>> (b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial

> duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.
>
> (2) You are not working at any job for wage or profit.
>
> (3) You are under the regular care of a Doctor.

Prudential argues that the denial of benefits was not arbitrary or capricious because the Medical Director's review of the record reasonably determined that McLaughlin had recovered from the debilitating effects of her surgery and that her remaining deficits (chronic back pain, edema, and incontinence) did not prevent her from resuming some kind of sedentary work. *Cf. Brigham v. Sun Life of Canada*, 317 F.3d 72, 82 (1st Cir.2003) (no rational decision-maker could conclude on the record that the insurer lacked a reasonable basis for its determination that a 47 year old paraplegic could return to sedentary work, at least in a part-time capacity). McLaughlin, for her part, relies on the opinion of her treating physician, Dr. Johnson, and the findings of Dr. Stelle, the Social Security examiner, to support her claim of total disability.

Under the arbitrary and capricious standard, the decision of the plan administrator will be upheld even where contrary evidence might suggest a different result, so long as the decision "is plausible in light of the record as a whole, ... or, put another way, whether the decision is supported by substantial evidence in the record." *Leahy*, 315 F.3d at 17. "Substantial evidence ... means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence.... [The] question [is] not which side [the

---

**6.** No such evidence has been produced in this case.

court] believe[s] is right, but whether [the administrator] had substantial evidentiary grounds for a reasonable decision in its favor." *Doyle,* 144 F.3d at 184. *See also Vlass v. Raytheon Employees Disability Trust,* 244 F.3d 27, 30 (1st Cir.2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary.").

 There is no requirement under ERISA that a plan administrator defer to the opinion of a claimant's treating physician. *Nord,* 538 U.S. at 834, 123 S.Ct. 1965 ("Plan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Nor, is the plan administrator precluded from relying on the assessment of a non-examining medical consultant. *Gannon v. Metropolitan Life Ins. Co.,* 360 F.3d 211, 216 (1st Cir.2004).

 As indicated in the Medical Director's report, Prudential rejected McLaughlin's claim for essentially two reasons. First, the Medical Director questioned whether McLaughlin's depression and anxiety had caused her to exaggerate her complaints of pain.[7] Second, he noted that the medical records showed "steady

and unbroken progress [since McLaughlin's surgery] with no evidence of setbacks, complications or other problems." He also rejected Dr. Johnson's opinion, presented in his August 21, 1999 letter, that McLaughlin was totally disabled, as patient advocacy. *See Nord,* 538 U.S. at 832, 123 S.Ct. 1965 ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.' ").

The first of the Medical Director's conclusions appears to be based on a misreading of the opinion rendered by the ALJ in the Social Security proceeding. According to the Medical Director, the award of Social Security disability benefits to McLaughlin "appears to have been based at least in part on [her] psychiatric history." The ALJ, however, clearly attributed McLaughlin's disability to her "status post excision of spinal tumor, chronic back pain, fatigue, bladder problems and ankle and leg edema." The only reference in the ALJ's decision to psychiatric problems is her mention of Dr. Stelle's note "that [McLaughlin] was feeling depressed in connection with her continued pain and financial stress" and that she "had been treated with medication for anxiety and panic attacks." There is no indication in the ALJ's ultimate findings that McLaughlin's statements regarding her mental condition influenced her conclusion that McLaughlin was disabled within the meaning of the Social Security Act.[8]

7. To a lesser extent, the Medical Director also questioned the extent to which McLaughlin's motor vehicle accident and the prospects of litigation might have influenced her subjective reports of pain.

8. The Medical Director also stated that McLaughlin "has been noted to have had a history of anxiety and panic disorder before the demonstration of her documented back

problems and she has apparently continued treatment for this since that time.... [Y]et we have no records of the nature or severity of these diagnoses or the potential impact on this claimant's perception of her Sx and circumstances as a result of them." The statement that McLaughlin had a "history" of anxiety and panic disorder is not supported by the record.

Prudential need not, however, establish that every reason that it gave for denying McLaughlin's claim was supported by the record; it need only show that in at least one material respect the record provides adequate support for its determination. In articulating the second ground for denying McLaughlin's claim, the Medical Director relied on Dr. Johnson's notes from McLaughlin's June 3, 1999 office visit reporting that her tendon reflexes were normal and that her clonus had subsided. He also cited notations culled from successive visits stating that McLaughlin "has done quite nicely . . . starting to regain her strength," "doing well . . . pleased with her progress," and "continues to show marked improvement . . . normal strength both proximally and distally (in the [lower extremities] )." And finally, in concluding that there was no reason why McLaughlin could not return to some kind of work, the Medical Director relied on McLaughlin's "generally normal" MRI and Dr. Johnson's observation that given the absence of symptoms of radiculopathy (disturbance in the spinal roots) he saw no reason to schedule further treatment.[9]

While there are adverse aspects of the record on which the Medical Director could have relied in reaching a different conclusion, for example, Dr. Johnson's February 23, 1999 note referencing McLaughlin's recurring problems with swelling in her feet and ankles and her intermittent incontinence, it is true, as the Medical Director implicitly found, that McLaughlin's prognosis, as reflected in the medical record, became progressively more positive as time healed the effects of her surgery. While the case is a close one,

and if reviewed *de novo* might be decided differently, I cannot say on balance that Prudential's decision is without credible support in the record.

### *ORDER*

For the foregoing reasons, Prudential's motion for summary judgment is *ALLOWED*. McLaughlin's cross-motion for summary judgment is *DENIED*. The Clerk will enter judgment for Prudential.

SO ORDERED.

---

**9.** Prudential's previous denials of McLaughlin's claim also cited the physical therapy finding that she had a "sitting tolerance [of] 50%–75%," the fact that Dr. Johnson in June of 1999 had cleared McLaughlin to resume her activities "as tolerated" without restriction, and a motor examination that had found her to have generally positive muscle strength and bulk. *See Doyle,* 144 F.3d at 184 (the capacity to work part-time supports a finding that a claimant is not "totally disabled from any occupation.").