Victoria GIANNONE

v.

**METROPOLITAN LIFE INSURANCE COMPANY,**

No. CIV.A. 02–11119–RGS.

United States District Court, D. Massachusetts.

March 30, 2004.

William Crowley, Westwood, MA, Jonathan M. Feigenbaum, Phillips & Angley, Boston, MA, for Victoria Giannone, Plaintiff.

James F. Kavanaugh, Jr. Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA, for Metropolitan Life Insurance Co., Defendant.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff Victoria Giannone received a long term disability allowance from the General American Life Insurance Company (GenAm) from January 31, 1987, until December 1, 2000, when the defendant successor insurer, Metropolitan Life Insurance Company (MetLife), terminated her benefits. Giannone brought suit seeking *de novo* review of MetLife's benefits revocation under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a). MetLife insists that because the Long Term Disability Plan (Plan) documents grant it discretionary authority over the award of benefits the court must apply an arbitrary and capricious standard of review. The dispute over the appropriate standard of review, while it occupies the bulk of the parties' attention, is ultimately of less significance than the issue of whether under either standard MetLife's decision is supported by substantial evidence.

## BACKGROUND

Giannone began working as a sales representative for Unitax, a subsidiary of McDonnell Douglas Corporation, on July 29, 1985. Her duties included calling on prospective and existing clients to solicit business; analyzing client service requirements; presenting sales proposals to prospects and customers; representing Unitax at meetings, conferences, and trade shows; and ensuring customer satisfaction. Giannone has a bachelor's degree and prior work experience in sales.

Giannone filed a claim for benefits on February 25, 1987, stating that she had become disabled after the birth of her first child on August 6, 1986. Giannone listed her disabilities as de Quervain's disease (thyroiditis) and bilateral carpal tunnel syndrome. While the contemporaneous medical records from Giannone's many treating physicians—Dr. Leffert (orthopedic surgeon), Dr. Miller (rheumatologist), Dr. McCarthy (radiologist), Dr. Aronoff (Director of the North Shore Pain Clinic), and Dr. Margles (orthopedist), report Giannone's complaints of severe hand pain and weakness, they also note "minimal clinical findings" and no "clinical evidence of carpal tunnel syndrome." The doctors, while persuaded of the genuineness of Giannone's complaints and her desire to heal, had difficulty identifying an appropriate diagnosis. Dr. Margles and Dr. Aronoff recommended psychotherapy to assist Giannone in coping with stress and possible postpartum depression.

GenAm approved Giannone's claim, and she began receiving benefits as of January 31, 1987. GenAm thereafter required Dr. Stoeckle, Giannone's internist, to submit an annual Attending Physician's Statement attesting to her continued disability. In August of 1988, Giannone was evaluated by Jack Strader, a GenAm rehabilitation

consultant. Strader reported that he doubted that rehabilitation therapy

would be productive. I do think that she should be seen by a good psychiatrist, doctor of rehabilitation medicine. However, I'm not too optimistic since she's seen some very good doctors who are basically stumped by her illness. I do feel that she continues to be totally disabled.

In June of 1989, GenAm initiated a claims investigation, which included surveillance of Giannone. The investigator reported that Giannone appeared disabled, and that she relied on her mother and husband to cope with child care, laundry, and house cleaning. After introducing himself to Giannone and conducting an interview, the investigator concluded that Giannone seemed "genuinely frustrated with her condition and [was] looking forward to returning to work." Dr. Stoeckle told the investigator that Giannone had "an enormous disability which is out of proportion to the clinical findings, but [that] he [was] certain that she is not malingering—there is no conscious avoidance of work to collect disability benefits—and her pain is quite real."

In his 1990 Attending Physician's Statement, Dr. Stoeckle changed his diagnosis from carpal tunnel syndrome to chronic fatigue syndrome. In October of 1990, Bernard Randolph, a GenAm rehabilitation specialist, reported that Giannone showed marked physical impairments and that because of "chronic pain and secondary gain factors (psychologic[al], monetary, and other) ... it will be extremely difficult to return her to the workplace." Randolph recommended a multi-disciplinary pain management program "in which organic diseases can be sorted out from behavioral and psychologic[al] issues and an effective,

coordinated plan of action can be pursued." In June of 1993, a GenAm vocational consultant recommended that Giannone undergo a functional capacity examination and a vocational evaluation and be seen by a psychiatrist. Giannone expressed interest, but stated that she would be spending the summer in Florida with her parents and children. On September 22, 1993, the vocational consultant reported that Giannone had declined to cooperate with the proposed rehabilitation plan.

On October 12, 1993, William Kermond, an orthopedic surgeon, conducted an independent medical examination on behalf of GenAm. Dr. Kermond concluded, "I do not believe that [Giannone] could return to her previous position as a sales representative because of the difficulty in the use of her hands." He continued, "[t]his may not be a permanent phenomen[on] and with further investigation and further treatment, she may be capable of returning to work sometime in the future."[1] On October 19, 1993, Dr. Robert Weiner, a psychiatrist engaged by GenAm, examined Giannone. Dr. Weiner concluded that Giannone's physical symptoms were psychological in origin and that she "may benefit from psychiatric treatment and hypnotherapy." Giannone did not seek psychiatric counseling. From 1994 through 2000, GenAm received yearly updates from Dr. Stoeckle. He reported that Giannone was disabled by chronic fatigue syndrome, or variously Raynaud's syndrome, fibromyalgia, and migraine headaches. He was also of the opinion that Giannone did not have a disabling psychiatric impairment.

On October 28, 1999, Dr. Jeffrey Guy, an orthopedic surgeon, examined Giannone after she complained of neck pain. He

---

1. On November 2, 1993, Dr. Kermond offered the additional opinion that while Giannone could not engage in any work that required her to drive, she might be able to work at home with a telephone headset.

found a full range of motion in Giannone's neck, "mild tenderness" along her trapezius, full strength in her arms and hands, no pain as a result of forward or lateral bending, and normal sensation and reflexes. In May of 2000, Giannone sought treatment at the Canyon Ranch Resort in the Berkshires. In a personal assessment completed for Canyon Ranch, Giannone indicated that she had begun exercising regularly on January 1, 2000. Her reported exercise regime included 30 minutes of cardiovascular exercise, 30 minutes of strength training, and 5 minutes of stretching, three times a week.

MetLife replaced GenAm as the administrator of the Plan in 2000. Under the terms of the Plan, to be eligible for the first twelve months of benefits, a participant must meet the following definition of "totally disabled": "[1] you are under the regular care of a licensed doctor who is not a member of your immediate family, and [2] you are unable to perform every duty of your occupation." After the first twelve months, the Plan defines "totally disabled" as follows: "[1] you remain under the regular care of a licensed doctor who is not a member of your immediate family, and [2] you are completely unable to work in any job for which you are qualified or for which you can become qualified by training, education, or experience." In July of 2000, MetLife requested current medical information from Giannone. On December 22, 2000, after Giannone had failed to respond to two such requests, MetLife terminated her benefits.

Spurred to action by the termination, on January 3, 2001, Giannone completed a lifestyle profile for MetLife. She stated that she drove her children to and from school (but often took to bed afterwards); that when she "felt up to it" she took care of the daily chores of life; that she bought mostly precooked and prepared foods because of her inability to lift pots and pans,

open jars, and chop food; that she typically awoke at around 6:45 a.m. and went to bed at around 10:00 p.m.; that she had not attempted to work since becoming disabled; that she did laundry, washed dishes, and went shopping (with family members' assistance); that her physician had not restricted her travel or driving; and that she read daily, took recreational walks, and swam occasionally.

On January 24, 2001, Dr. Stoeckle submitted his annual Attending Physician's Statement. His diagnoses of Giannone's condition included fibromyalgia, chronic fatigue syndrome, and Raynaud's syndrome. He reported that Giannone had "slight" psychological limitations, but was able to function under stress and engage in normal interpersonal relations. In Dr. Stoeckle's estimate, Giannone was able to sit for two hours, stand for one hour, and walk for one hour, all intermittently. She was able to climb, twist, bend, and stoop, reach above her shoulder level, and operate a motor vehicle. She could perform repetitive fine finger and eye and hand movements with both hands. Dr. Stoeckle concluded, however, that Giannone was able to work "a total of 0 hours per day" because of the sum of her physical limitations.

On April 25, 2001, a MetLife case manager, Bonnie Knutti, informed Giannone that her benefits were being terminated because of the lack of objective medical evidence supporting Dr. Stoeckle's diagnosis of fibromyalgia and chronic fatigue syndrome. Knutti stated that MetLife would reconsider if Giannone provided documentation of her treatment, including doctors' office notes, results of physical examinations, laboratory findings, records of mental health treatment, and physical therapy and pharmacy records.

On May 10, 2001, Dr. Stoeckle's office printed a case summary for MetLife com-

piling the entries in Giannone's medical records from 1986 through a visit on January 10, 2001. The summary indicated that Giannone had first reported chronic fatigue on November 17, 1989, and migraine headaches on November 28, 1995. The summary also indicated that a diagnosis of fibromyalgia was first made on May 21, 1997, although indicative symptoms had been recorded as early as February 18, 1993. The last entry suggesting carpal tunnel syndrome was dated December 31, 1990.

On June 13, 2001, Giannone formally appealed MetLife's decision to terminate her benefits. In support of her appeal, she submitted a June 5, 2001 letter from Dr. Stoeckle, together with his curriculum vitae, and pharmacy records. While Dr. Stoeckle's letter repeated his opinion that Giannone was totally disabled, he did not forward any additional medical records. On July 24, 2001, Met Life denied Giannone's appeal, explaining as follows.

> As noted in our April 25, 2001, letter, we have not been provided with medical documentation noting and identifying the current active tender points. We have not received any current objective physical examination findings or office notes. No treatment plan was noted. We also have not received any physical therapy, counseling or mental health assessments. We did not receive medical records that documented or supported Dr. Stoeckle's June 5, 2001 letter. We have determined that the additional medical information submitted on appeal does not change our previous decision to terminate benefits.

On September 1, 2001, Giannone submitted further medical records from Dr. Stoeckle and the Massachusetts General Hospital (MGH), progress notes from the Canyon Ranch Health Resort, an Arthritis Foundation pamphlet discussing fibromyalgia, and a letter from the Tufts Health Plan denying Giannone's request for coverage for acupuncture treatment. Giannone pointed out that her fibromyalgia was documented in the MGH records, as for example, in a medical note from a May 21, 1997 visit to Arthritis Associates,[2] in an October 20, 1999 letter from the MGH/Physical Therapy Department, in a case summary note and pharmacy report dated May 10, 2001, and in an Internal Medicine Associates note of January 10, 2001.

On November 5, 2001, Giannone submitted additional information in support of her appeal, including an October 5, 2001 office note and an October 18, 2001 report from Dr. William Pachas, a rheumatologist at MGH who had assumed Giannone's care from Drs. Miller and Phillips. The October 5, 2001 office note indicated that Giannone had a fifteen year history of fibromyalgia; that fatigue was her most disabling symptom; that she reported memory difficulties and spatial problems; and that her laboratory results were normal. Dr. Pachas concluded that Giannone was mildly depressed. He also noted that she exhibited eighteen of the eighteen tender points associated with fibromyalgia. In his October 18, 2001 report, Dr. Pachas stated that Giannone "suffers from extremely severe fatigue and generalized body pains" and "remains totally incapacitated for work on the account of her severe symptoms."

**2.** MetLife contends that the Arthritis Associates notes are inconsistent with a diagnosis of fibromyalgia. For example, an Arthritis Associates physical examination conducted on April 16, 1997 found Giannone's musculoskeletal system to be normal, including a full range of motion in all joints. Nonetheless, the evaluator concluded that "although her history is somewhat unusual, she certainly does have most features of fibromyalgia including tender points on exam."

On December 5, 2001, Dr. Jeffrey Kahn, who is board certified in physical medicine and rehabilitation, was hired by MetLife to review Giannone's medical records. Dr. Kahn focused on the fact that Giannone had never pursued the psychiatric treatment recommended by Dr. Weiner in 1993.

There is an inconsistency between the stated physical capabilities noted by Dr. Stoeckle in his attending physician report, the claimant's own stated physical capacities at that same time, and his rendered opinion that Giannone would be incapable of working in any capacity for any period of time. Unless a non-physical source of incapacity from work such as a psychiatric disorder is offered as an explanation for why retained physical capacities are not translatable into work capacity, there is no obvious explanation for this discrepancy. However, depression or other psychiatric condition is not offered as the major disabling condition at the time of form completion.

On January 18, 2002, MetLife upheld its termination of Giannone's benefits, referencing Dr. Kahn's report and his comments on Dr. Stoeckle's January 24, 2001 Attending Physician's Statement. "We [MetLife] have determined that the additional medical information submitted for the second appeal does not change our previous decisions to terminate benefits." On April 2, 2002, Giannone's attorney requested a further review, enclosing a letter from Dr. Stoeckle responding to Dr. Kahn's report. On April 18, 2002, MetLife denied the request. On June 4, 2002, Giannone filed this action.

## DISCUSSION

Giannone seeks to "recover disability benefits due her under the Plan, to enforce her rights under the Plan, and to seek clarification of her right to future benefits under the Plan." Complaint ¶ 6. *See Turner v. Fallon Community Health Plan, Inc.*, 127 F.3d 196, 198 (1st Cir.1997).

Count I of the Complaint alleges that MetLife's termination of Giannone's benefits was not supported by substantial evidence. Count II asserts that MetLife's review of Giannone's appeal was biased because of a financial conflict of interest.

■ *De novo* review is the default standard for ERISA claims "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If plan administrators are granted such authority, an "arbitrary and capricious" standard of review will apply. *See Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir.1997). Under this deferential standard, the decision of a plan administrator will be upheld even where contrary evidence might suggest a different result, so long as the administrator's decision is reasoned and supported by substantial evidence in the record. *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997). Despite the holding of *Firestone Tire*, plan sponsors have been unaccountably loath to amend their plans to make the delegation of discretionary authority unambiguously explicit. The result is a plenitude of litigation contesting the standard of review to be applied in individual cases, with claimants advancing inventive, if at times impervious, arguments for applying the more friendly *de novo* standard. *See, e.g., Brigham v. Sun Life of Canada*, 317 F.3d 72, 80–81 (1st Cir.2003); *Terry v. Bayer Corp.*, 145 F.3d 28, 37 (1st Cir.1998); *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 583–584 (1st Cir.1993).

■ This case is no exception. Giannone first asserts that Met Life can point to no specific grant of authority that it (as opposed to its predecessor GenAm) re-

ceived from Giannone's former employer, McDonnell Douglas (now Boeing).[3] She cites *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789 (8th Cir.2003), where the Court found that a substituted claims administrator had improperly assumed discretionary authority that had never been delegated by the plan sponsor to either it or its predecessor. Here, by contrast, GenAm served dual roles as the insurer and administrator of a Plan that unambiguously conferred discretionary authority on the Plan's "insurer." When MetLife, pursuant to a court-ordered liquidation, acquired all of the assets and liabilities of GenAm, it stepped into GenAm's shoes, and in so doing acquired all of the powers conferred by the Plan on GenAm, including the discretionary authority to make benefits decisions.[4]

■ Giannone's second contention is that none of the relevant Plan documents—the 1989 Summary Plan Description (SPD), the 1986 Group Insurance Certificate, or the 1985 SPD—contain sufficiently explicit language conferring discretion on the Plan administrator.[5] This argument is impossible to reconcile with the plain wording of the documents themselves. The 1989 SPD states that:

[e]ach insurance company has the exclusive right to interpret the provisions of the plans it offers or administers. The decisions of the insurance company are conclusive and binding.

The 1985 SPD contains nearly identical language, specifying that:

[t]he insurance company has the exclusive right to interpret provisions of the Program and its decisions are conclusive and binding.

■ Giannone next argues that the 1986 Group Insurance Certificate "should be the sole controlling document for purposes of determining Mrs. Giannone's eligibility for disability benefits, and for [the] administration and payment of benefits." Plaintiff's Memorandum, at 5. The thrust of the

---

3. "There are three ways to acquire fiduciary status under ERISA: (1) being named as the fiduciary in the instrument establishing the employee benefit plan, 29 U.S.C. § 1102(a)(2); (2) being named as a fiduciary pursuant to a procedure specified in the plan instrument, [for example], being appointed an investment manager who has fiduciary duties toward the plan, 29 U.S.C. § 1102(a)(2); 29 U.S.C. § 1002(38); and (3) being a fiduciary under the provisions of 29 U.S.C. § 1002(21)(A), which provides that a person is a fiduciary 'with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting the management or disposition of assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.' 29 U.S.C. § 1002(21)(A)." *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc.*, 93 F.3d 1171, 1179 (3d Cir.1996). MetLife falls into the first and third categories.

4. The following information about MetLife's acquisition of GenAm appears on the Missouri Department of Insurance website, www.insurance.mo.gov/news/genam/faq.htm.

As a result of a liquidity crisis, General American Life Insurance Co. (GALLIC) was placed under Missouri Department of Insurance (MDI) administrative supervision in August 1999. At that time, all parties agreed that the best solution was the sale of GALLIC and its affiliates. Metropolitan Life Insurance Co. (MetLife) purchased the companies from the parent, General American Mutual Holding Co. (GAMHC), for $1.2 billion on Jan. 6, 2000. MDI administrative supervision ended at that time.

5. Giannone's argument in this regard is inconsistent with her Complaint, in which she alleges that "[t]he Defendant MetLife serves as fiduciary and administrator the [sic] Plan, and in that role, it exercises discretion to interpret provisions of the Plan." Complaint ¶ 21.

argument, which is somewhat difficult to grasp, apparently rests on the contention that the Certificate, which Giannone asserts confers only limited discretion on the insurer, cannot be augmented by the arguably broader discretionary language contained in either the 1985 or the 1989 SPD. The rule under ERISA, however, is that a court will consider all of the relevant Plan documents, including the SPDs, in construing a Plan. *See Bond v. Cerner Corp.,* 309 F.3d 1064, 1067–1068 (8th Cir.2002) ("When construing the language of an ERISA plan we begin by examining the language of the plan documents. Each provision should be read consistently with the others and as part of an integrated whole."). Moreover, the Certificate does contain discretionary language. It states that:

> [w]hile a claim is pending, the Insurance Company, at its own expense, will have the right to request a medical examination for the employee and its determination of his Total Disability will be conclusive.

Giannone argues that a "fair reading" of this clause grants the administrator the discretion to order an independent medical examination while a claim is pending, and nothing more. Even if this reading of the clause was accurate, Giannone's argument that her claim is no longer "pending" is simply incorrect as under the Plan disability benefits are subject to termination whenever MetLife determines that a participant is "no longer totally disabled." Thus, a claim is "pending" so long as benefits are being paid.

Next, Giannone argues that her case should be governed solely by the 1985 SPD, which was in effect at the time she became disabled.

> There is no basis to import a deferential standard of review from an amended plan that was implemented after the onset of Mrs. Giannone's disability, and which potentially could detrimentally affect her rights. Since Mrs. Giannone was already determined to be disabled under an earlier plan document, it is patently unfair to subject her to a different level of review after the fact.

Plaintiff's Memorandum, at 13. Even if this argument was true, it is of no help to Giannone because, as previously noted, the 1985 SPD states that "[t]he insurance company has the exclusive right to interpret provisions of the Program and its decisions are conclusive and binding." This language is plainly sufficient to give Giannone "the requisite if minimum clarity that a discretionary determination is envisaged." *Herzberger v. Standard Insurance Co.,* 205 F.3d 327, 331 (7th Cir.2000). *See also Brigham,* 317 F.3d at 81.

■ Finally, Giannone argues that a *de novo* standard of review should be applied because of the conflict of interest that arises "when an insurer [like MetLife] serves as plan fiduciary and pays claims out of its own assets." Plaintiffs' Memorandum, at 16. This is a familiar argument and the First Circuit has gone so far as to say that where a genuine conflict of interest exists, a review under the arbitrary and capricious standard should be given "more bite." *Doyle v. The Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.1998). Courts, however, are reluctant to infer a conflict of interest from the mere fact that an entity acts as both insurer and plan administrator, *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.,* 230 F.3d 415, 419 (1st Cir.2000), or may have an ecumenical concern for preserving company assets. *Doe v. Travelers Insurance Co.,* 167 F.3d 53, 57 (1st Cir.1999).

Turning to the substance of the case, Giannone argues that even under a deferential standard of review, MetLife's decision to terminate her benefits was arbitrary and capricious because: (1) MetLife's rationale for the denial of ben-

efits changed with each additional submission of medical evidence; and (2) MetLife failed to obtain the independent opinion of an expert qualified to evaluate fibromyalgia. MetLife's initial, and perfectly understandable, decision to terminate Giannone's benefits was based on her failure to respond to repeated requests to bring her medical information up to date. After agreeing to give Giannone a second chance, and after receiving additional information, MetLife engaged Dr. Kahn to conduct an evaluation of Giannone's medical records. Based on Dr. Kahn's review, MetLife reaffirmed the denial of Giannone's appeal.

■■ There is no requirement under ERISA that a plan administrator base its decision on the opinions of a claimant's treating physicians. *See Matias–Correa v. Pfizer, Inc.,* 345 F.3d 7, 12 (1st Cir.2003). *See also Black & Decker Disability Plan v. Nord,* 538 U.S. 822, ——, 123 S.Ct. 1965, 1972, 155 L.Ed.2d 1034 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician . . . ."). Nor, is the administrator precluded from relying on the assessment of a non-examining physician like Dr. Kahn. *Gannon v. Metropolitan Life Ins. Co.,* 360 F.3d 211, 214–16 (1st

Cir.2004). Still, MetLife's complete rejection of the opinions of Dr. Stoeckle and Dr. Pachas and its total embrace of Dr. Kahn's evaluation is questionable. Dr. Kahn's cursory summation of the medical evidence is based on the speculative conclusion, derived principally from the eight year old report of Dr. Weiner (who had not examined Giannone), that Giannone's ailments are psychosomatic in origin. For example, Dr. Kahn noted what he thought was an "inconsistency between the stated physical capabilities noted by Dr. Stoeckle" (as well as those reported by Giannone herself) and Dr. Stoeckle's ultimate opinion that Giannone was incapable "of working in any capacity." In Dr. Kahn's view, this "inconsistency" could only be explained by a "psychiatric disorder." Hence, his conjecture that Giannone's fibromyalgia "may in fact *possibly* be a manifestation of longstanding unresolved depression as suggested at the onset of her complaints." (Emphasis added). This is perhaps true, although Dr. Kahn's "known clinical perspective" that fibromyalgia is a psychiatrically-induced disorder may not be medically sound.[6] *Cf. Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 918–919 (7th Cir.2003). Of greater significance, however, is the fact that Dr. Kahn's report does not address either the issue of Giannone's disability (whatever its etiology) or her capacity for gainful employment.[7]

---

**6.** Fibromyalgia has achieved clinical acceptance as a recognized medical syndrome only in the last decade or so. While there is no consensus as to the cause of its many symptoms, current medical thinking suggests (in addition to psychological or psychiatric factors), a chemical imbalance causing nerve cells in the spinal cord and brain to become oversensitized, an imbalance of brain chemicals altering mood and lowering a patient's threshold for pain, and hormonal deficiencies resulting in similar mood effects.

**7.** In its brief, MetLife contends that Dr. Stoeckle's advice to Giannone to exercise more and her statement to Canyon Ranch that she was exercising three times a week are "impossible to reconcile" with Dr. Stoeckle's opinion that Giannone is not able to work even an hour a day. The brief also cites Giannone's statement that when she "feel[s] up to it [she] takes care of the daily responsibilities of life." And finally, MetLife cites Dr. Guy's 1999 findings that Giannone's musculoskeletal system was "essentially normal," and that she had full strength in her arms and hands. There is, however, no indi-

Substantial evidence is evidence "reasonably sufficient to support a conclusion." *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir.2001). But one would think that substantial evidence means actual evidence, not third-hand speculation about the possible cause of a claimant's disability. Two recent First Circuit decisions involving MetLife are illustrative. In *Vlass*, the district court was persuaded by the "impressive" opinion of Vlass's primary treating physician that his diabetic neuropathy and chronic pain had rendered him permanently disabled and incapable of any kind of physical activity. In overturning the district court, the Court of Appeals noted that MetLife had based the denial of benefits on the contrary opinions of other of Vlass's physicians, a vocational assessment that had found Vlass capable of performing sedentary to light level work, and a "damning" surveillance report showing Vlass engaged in strenuous physical activity. Similarly, in *Gannon*, despite a treating physician's finding of total disability, the First Circuit noted that MetLife had relied on a physical therapist's evaluation, made after a two day physical examination, that Gannon was capable of working a full forty hour week, a Social Security Administration finding (in denying Gannon disability benefits) that she was able to move about, sit most of the day, and lift up to ten pounds, and an investigator's report of having observed Gannon, in a single day, driving to the post office, shopping at a department store, and visiting a car dealership. *Gannon*, 360 F.3d at 212–214. A doctor who performed an independent review of Gannon's medical records concluded that she could do sedentary work. Finally, a vocational consultant identified a number of occupations that Gannon could perform based upon her experience and qualifications. Looking at the sum of this evidence, the Court of Appeals concluded that "in the aggregate, MetLife's evidence is both substantial and *reasonably supportive of its decision to terminate Gannon's disability benefits.*" *Id.* at 213–14.

Here by contrast, the minimal evidence on which MetLife relied in determining that Giannone is not totally disabled, when weighed against a documented fifteen year medical history and the uniform opinion of a half-dozen treating physicians (and Gen-Am's own investigator) that her complaints are genuine, compels the conclusion that MetLife's decision, to the extent that it finds support in the record, was "overwhelmed by contrary evidence," and was therefore an abuse of discretion. *See Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir.1996), *abrogated on other grounds by*

cation in the record that MetLife's administrators relied on these facts in deciding to terminate Giannone's benefits. The final denial of Giannone's appeal cites only Dr. Kahn's report as its basis. Whether a court may credit evidence in the record that the administrator could have relied upon, despite the lack of any indication that the administrator did in fact rely on such evidence, to my knowledge has not been addressed by the First Circuit. *But see University Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 848 n. 7 (6th Cir.2000).

[I]t strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review....To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them—or, worse yet, federal judges—to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

### ORDER

For the foregoing reasons, Giannone's motion for summary judgment is *ALLOWED* as to Count I of the Complaint and *DENIED* as to Count II.[8] MetLife's cross-motion for summary judgment is *DENIED.* The case will be *REMANDED* to MetLife for the limited purpose of calculating the benefits owed to Giannone from her benefits termination date of December 1, 2000, to May 1, 2004, the date on which the court will enter final judgment ordering restitution and reinstatement. It remains open to MetLife thereafter to require Giannone to provide continuing documentation of her disability and to cooperate with any reasonable request to submit to an independent medical examination or vocational or rehabilitation assessment. As the prevailing party, Giannone will submit a proposed form of final judgment on or before May 15, 2004. The court will entertain an application from Giannone's counsel for an award of reasonable attorney's fees and costs. *See* 29 U.S.C. § 1132(g)(1). *Cf. Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220, 225 (1st Cir.1996). Counsel should also consult *In re Fidelity/Micron Sec. Litig.,* 167 F.3d 735, 738–739 (1st Cir.1999).

SO ORDERED.

---

8. The court recognizes that "summary judgment" is something of a misnomer in an ERISA context, *see Recupero,* 118 F.3d at 834, but will adopt the nomenclature assigned to the motions by the parties.