Ramonita MARQUEZ–MASSAS, Plaintiff,

v.

SQUIBB MANUFACTURING, INC., et al., Defendants.

Civ. No. 01–1298(RLA).

United States District Court, D. Puerto Rico.

Oct. 27, 2004.

cy issued by Defendant, Prudential Insurance Company of America ("Prudential").

The action was initially brought against both Brystol and Prudential but Plaintiff subsequently dismissed the claims asserted against her employer.[1]

Prudential has moved the court to enter summary judgment upholding its decision which Plaintiff has opposed. The court having reviewed the memoranda filed by the parties in light of the applicable law and the record before it hereby finds as follows.

## FACTUAL BACKGROUND

Effective on January 1st, 1981, Prudential issued a Group Long Term Disability Policy (the "Policy") to insure a Long Term Disability Plan (the "LTD Plan") established by Brystol for the benefit of its employees. The LTD Plan is an employee welfare benefit plan covered by ERISA.

Prudential acted as claims administrator for claims filed under the Policy. In that capacity Prudential processed, reviewed, approved and/or denied long term disability benefit claims filed under the Policy.

The LTD Plan and the Policy provided benefits to any covered employee/participant who became totally disabled provided the employee met the definition of "Total Disability" and that the disability was continuous.

Pursuant to the terms of the Policy, a covered employee is considered totally disabled when he/she meets the following conditions: due to sickness or accidental bodily injury (a) the covered employee is completely unable to perform any and every duty pertaining to his occupation with the Employer; and (b) after the Initial Duration of a period of disability, the covered employee is completely unable to en-

Melba N. Rivera Camacho, Carolina, PR, Raymond L. Sánchez–Maceira, San Juan, PR, for Plaintiff.

Ricardo J. Cata–Lazo, Wilson, Elsen, Moskowitz, Edelman & Dicker, LLP, Miami, FL, for Defendant.

## *ORDER GRANTING PRUDENTIAL'S MOTION FOR SUMMARY JUDGMENT*

ACOSTA, District Judge.

Plaintiff, Ramonita Marquez Massas, filed the present action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging the termination of benefits received under the Long Term Disability Plan established by Plaintiff's ex-employer, Brystol Myers Squibb Manufacturing Corporation ("Brystol") and insured by a poli-

**1.** *See* Partial Judgment, filed on September 3, 2002 (docket No. 37).

gage in any and every gainful occupation for which he is reasonably fitted by education, training or experience.

Plaintiff was a Brystol employee from December 1986 until August 2, 1994, a participant under Brystol's LTD Plan, and a covered employee insured by the Policy.

Plaintiff held the position of Payroll Accountant. Her duties in this position included processing employees' paychecks, entering the necessary information into the payroll system, performing account analyses of payroll accounts, tracing and adjusting errors, and maintaining close control over time card's distribution.

On August 2, 1994, Plaintiff became disabled due to medical conditions related to a back problem and began receiving short-term disability benefits for a period of 26 weeks.

At the conclusion of that 26–week period, in December 1994, Plaintiff applied for long term disability benefits under the Policy.

Upon review of her medical records, Prudential determined that Plaintiff was totally disabled from performing the duties of her own occupation and approved benefits for an initial period of 12 months, commencing January 31, 1995. When the end of the initial 12 month period was approaching, Prudential advised Plaintiff it would conduct a thorough evaluation of her condition to determine whether, after January 31, 1996, she continued to be eligible for disability benefits under the Policy.

On April 8, 1996, Prudential completed its evaluation of Plaintiff's conditions and determined that she was eligible to continue to receive disability benefits under the Policy since, at that time, Plaintiff was totally disabled from performing the duties of any job. However, Plaintiff was informed that another evaluation would be conducted in April 1997 to determine whether she still remained totally disabled under the terms of the Policy.

In July 1997 Prudential initiated a new evaluation process of Plaintiff's condition and decided to extend Plaintiff's disability benefits until April 30, 1998 while it continued to evaluate Plaintiff and analyze the medical information provided by her.

Based on its assessment, Prudential concluded that Plaintiff was no longer eligible to continue receiving disability benefits under the Policy and on August 27, 1998, Plaintiff was notified that her LTD claim was being denied. Plaintiff was informed that, in light of her physical condition, her educational background and professional experience, she was able to work in a sedentary job.

Disagreeing with Prudential's determination, Plaintiff requested reconsideration. On February 19, 1999, Prudential finalized its review of Plaintiff's claim on Appeal and concluded that it was appropriate to uphold the decision to terminate Plaintiff's long term disability benefits. The decision was affirmed on February 21, 1999.

Once again Plaintiff appealed Prudential's denial of benefits, this time represented by counsel. Prudential performed yet another evaluation and concluded that there was no objective evidence substantiating total disability from performing the duties of any sedentary job, with the restrictions of no over the shoulder right arm work or static use of the arms in an extended outreached position. Accordingly, on June 3, 1999, Prudential reaffirmed its determination to deny long term disability benefits.

Upon receipt of the letter upholding the denial of benefits, Plaintiff requested a final review of the decision. This last review was performed by the Appeals Committee. In evaluating Plaintiff's claim on appeal, the Committee considered Plain-

tiff's entire claim file, including all additional medical evidence submitted by Plaintiff for the appeal.

Upon completing an evaluation of Plaintiff's entire claim and medical records, the Committee confirmed the decision to terminate Plaintiff's disability benefits. Prudential concluded that Plaintiff's medical record, including the new documentation, did not support a finding of total disability from performing the duties of any sedentary job.

The Appeals Committee informed the Plaintiff of its final decision to uphold the denial of long term disability benefits on August 24, 1999.

## SUMMARY JUDGMENT

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660–61 (1st Cir.2000); *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 45 (1st Cir.1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. *De-Novellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. *Morris-*

*sey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir.1995).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir.2001); *Grant's Dairy v. Comm'r of Maine Dep't of Agric.*, 232 F.3d 8, 14 (1st Cir.2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". *Lopez–Carrasquillo v. Rubianes*, 230 F.3d 409, 412 (1st Cir.2000); *Maldonado–Denis v. Castillo–Rodríguez*, 23 F.3d 576, 581 (1st Cir.1994); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

## ERISA

### Standard of Review

Plaintiff claims Prudential's determination is erroneous and that she is entitled to LTD benefits under the Policy. In support of her allegations, Plaintiff claims that: (1) she suffered from various medical conditions which allegedly limited her ability to work; (2) Prudential failed to make an adequate residual functional capacity assessment, taking into consideration the opinions of Plaintiff's treating physicians; (3) Prudential failed to evaluate the vocational factors that allegedly showed that Plaintiff was unable to perform any type of employment in the national economy; and (4) the opinions of her treating physicians were not given sufficient weight.

■ As a preliminary matter we must determine which standard the court will apply in reviewing Prudential's decision to discontinue the benefits. Defendant argues that Plaintiff is bound to the "arbitrary and capricious standard" consistently

used by her since the onset of this litigation. Plaintiff specifically adopted this standard in her allegations in the complaint,[2] in her legal theory portion of the Joint Initial Scheduling Conference Memorandum,[3] and stipulated thereto at the Initial Scheduling Conference.[4]

The court agrees with Prudential's argument that stipulations made during judicial proceedings are binding and that ordinarily counsel may not disregard them at will. The court, however, may relieve parties from erroneous stipulations to prevent manifest injustice. Further, "[r]elief from erroneous stipulations is especially favored where the mistake made concerns a legal conclusion." *TI Federal Credit Union v. DelBonis,* 72 F.3d 921, 928 (1st Cir.1995).

In this particular case not only does the stipulation pertain to a legal matter, i.e., the applicable standard of judicial review, but it also concerns the rights of a specially vulnerable Plaintiff. Accordingly, we will not bind Plaintiff to the aforementioned stipulation. Rather, we shall peruse the pertinent documents to ascertain whether the denial of benefits should be examined under the arbitrary and capricious standard or under a *de novo* review.

ERISA does not specify the standard to be used by the courts in reviewing denial of benefits. However, the United States Supreme Court in addressing this matter has ruled that "a denial of benefits challenged under Section 502(a)(1)(B) of ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator, or fiduciary, discretionary authority to determine eligibility for bene-

fits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 950, 103 L.Ed.2d 80, 95 (1989); *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 122 S.Ct. 2151, 2170, 153 L.Ed.2d 375 (2002).

The First Circuit Court of Appeals has consistently followed *Firestone* directing *de novo* review of benefit determinations unless the benefit plan grants discretionary authority to the administrator or fiduciary. *See Campbell v. BankBoston, N.A.,* 327 F.3d 1, 6–7 (1st Cir.2003); *Cook v. Liberty Life Assurance Co. of Boston,* 320 F.3d 11, 18 (1st Cir.2003); *Brigham v. Sun Life of Canada,* 317 F.3d 72, 80 (1st Cir. 2003); *Terry v. Bayer Corp.,* 145 F.3d 28, 37 (1st Cir.1998).

Thus, *de novo* review is the default standard unless the plan specifically allows for discretionary authority. *Rush Prudential,* 536 U.S. at 386, 122 S.Ct. at 2170, 153 L.Ed.2d at 402; *Brigham,* 317 F.3d at 80; *Terry v. Bayer Corp.,* 145 F.3d at 37; *McLaughlin v. The Prudential Life Ins. Co. of America,* 319 F.Supp.2d 115, 124 (D.Mass.2004).

■ Further, it is the plan administrator's burden to establish that the arbitrary and capricious review standard applies. *Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2nd Cir.2002); *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2nd Cir.1999).

If the administrator or fiduciary is given discretion to determine eligibility of benefits or to construe the terms of the plan

---

**2.** In pertinent part, Plaintiff alleges that "Prudential *arbitrary, capricious and totally unsupported by the substantial evidence of record presented to Prudential at that time".* Complaint ¶ 8 (emphasis in original).

**3.** *See,* Joint Initial Scheduling Memorandum pp. 13–14. (docket No. 34).

**4.** The ISC Minutes specifically note that "[a]ll parties ... agree[d] on the arbitrary and capricious standard of review of Plaintiff's claim under ERISA". (docket No. 35) p. 1.

the "arbitrary and capricious" standard will be applied in which case coverage decisions will be reviewed with a degree of deference to the administrator. *Kolling v. Am. Power Conversion Corp.*, 347 F.3d 11, 13 (1st Cir.2003); *Lopes v. Metro. Life Ins. Co.*, 332 F.3d 1, 4 (1st Cir.2003); *Brigham*, 317 F.3d at 81. Where the discretionary grant is found, "*Firestone* and its progeny mandate a deferential arbitrary and capricious standard of judicial review." *Recupero v. New England Tel. and Tel. Co.*, 118 F.3d 820, 827 (1st Cir.1997) (internal quotations omitted); *Pari–Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 418 (1st Cir.2000); *Terry v. Bayer Corp.*, 145 F.3d at 37.

On arbitrary and capricious review, [the administrator's] decision will be upheld if the denial is reasonable and supported by substantial evidence." *Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 126 (1st Cir.2004); "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." *Gannon v. Metro., Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir.2004). "[T]he proper standard for reviewing the decision of an insurer that has such discretionary authority is the arbitrary and capricious standard, but... 'the reasonableness of the insurer's decision determines whether or not it constituted an abuse of the discretion vested in the insurer by the plan". *Dandurand v. Unum Life Ins. Co. of America*, 284 F.3d 331, 335–6 (1st Cir.2002) (citing *Pari–Fasano*, 230 F.3d at 418); *see also, Lopes*, 332 F.3d at 6; *Cook*, 320 F.3d at 19.

On the other hand, in applying a *de novo* standard the court will examine whether the determination was incorrect or mistaken as opposed to unreasonable. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir.2000); *Black v. Unum Life Ins.*

*Co. of America*, 324 F.Supp.2d 206, 210 (D.Me.2004); *Deal v. Prudential Ins. Co. of America*, 222 F.Supp.2d 1067, 1070 (N.D.Ill.2002). *De novo* review "allows the court to substitute its decision for that of the plan administrator." Kathryn J. Kennedy, *Judicial Standard of Review in ERISA Benefit Claim Cases*, 50 Am. U.L.Rev. 1083, 1084 (June, 2001). In making a de novo review the court's role is to ascertain whether the decision was correct.

## The Language

In some cases the discretion conferred upon the administrator is readily apparent from the policy language. However, in other situations discretion is not evident from the policy terms and the court's determination is more difficult. "While the choice of standards is clear-cut, there remains considerable debate over what language constitutes a sufficiently clear grant of discretionary authority to transform judicial review from de novo to deferential." *Brigham*, 317 F.3d at 81.

The courts recognize that "there are no 'magic words' determining the scope of judicial review of decisions to deny benefits." *Id.* (citing *Herzberger*, 205 F.3d at 331). Documents providing that "[t]he Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan [and that] [a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless... [it] was arbitrary or capricious" have been found sufficient to allow specific grant of discretion. *Lopes*, 332 F.3d at 4 n. 5. Authority to "construe the terms of [the] policy and to determine benefit eligibility [thereunder]" have also been held sufficient to allow for discretion. *Cook*, 320 F.3d at 19. Wording providing for a subjective assessment, i.e., that the evidence submitted be satisfactory to the insurer or the administrator has been con-

sidered a sufficient grant of discretionary authority. *Brigham*, 317 F.3d at 81.

On the other hand, a policy provision that insurer would pay benefits when "it receives due proof" that plan conditions are met is not sufficient. *Rivera v. Cornell Univ.*, 297 F.Supp.2d 412 (D.P.R. 2003).

■ Based on the foregoing, the specific Plan provisions must be examined in order to ascertain whether or not Prudential[5] was granted sufficient discretionary authority to trigger the arbitrary and capricious standard of review.

Prudential cited the following segment of the Plan as evidence of its discretionary authority:[6]

Section 6.4    *Notice of Claim:* ...Prudential must be given written notice that a claim will be made. The notice must be given to Prudential within 30 days....

Section 6.5    *Proof of Loss:* Prudential must be given written proof of loss....

Section 6.6    *Physical Exam:* Prudential, at its own expense, has the right to examine the person whose loss is the basis of claim. Prudential may do this when and as often as is reasonable while the claim is pending.

We find that the aforementioned provisions do not denote any degree of discretion in the interpretation or evaluation of the claim. Rather, Prudential's role thereunder is limited to the ministerial function of receiving and processing the notice of claim and proof of loss and submitting claimant to medical evaluations.

■ Additionally Prudential argues that the section copied below denotes discretion because it suggests "that an employee's statements must persuade Prudential that such employee is covered under the Plan and, therefore, entitled to benefits [ ] and ... that an employee's statements can be used by Prudential to contest such employee's coverage."[7]

Section 6.8    Incontestability of Coverage to which the claim Rules Apply
This limits proof of loss is required. (sic) Prudential's use of the Employee's statements in contesting an amount of coverage for which the Employee is covered. These are statements made to persuade Prudential to effect an amount of coverage. The statements will be considered to be made to the best of the Employee's knowledge and belief.
These rules apply to each statement:
(1) it will not be used in a contest to avoid or reduce the amount of coverage unless:
    ....
(2) It will not be used in the contest after that amount of insurance has been in force, before the contest, for at least two years during the lifetime of the Employee.

However, this particular section merely restricts Prudential's ability to use an employee's statements submitted in contesting the amount of coverage. It does not denote discretion nor raise to the specifici-

**5.** Plaintiff argues that Prudential is not the Plan Administrator because the Benefits Manual specifically designated BRISTOL's Human Resources Senior–Vice–President as the Plan's fiduciary and the Human Resources Vice–President as the Administrator. However, this argument is of no consequence for purposes of the issue presently before us. There is no dispute that Prudential acted as claims administrator in this case. It was Prudential who processed Plaintiff's claim, controlled the review process, and ultimately decided on Plaintiff's long-term disability coverage. *See, i.e., Boardman v. The Prudential Ins. Co. of America*, 337 F.3d 9 (1st Cir.2003).

**6.** Prudential also quoted *Section 4.4 Benefits for Expenses of Rehabilitation* which is inapposite to the facts before us inasmuch as rehabilitation is not at issue in Plaintiff's case.

**7.** Prudential's Reply (docket No. 62) p. 26.

ty level required by *Firestone* and its progeny.

The Policy terms fare no better. No specific degree of evidence or standard of subjective evaluation is mentioned in the documents before us. The Policy merely provides the definition of the long term disability for coverage purposes.

Thus, based on the foregoing, even though we agree with Prudential that no "magic words" are required to denote discretion the cases have consistently mandated language which categorically suggests the administrator's freedom of interpretation of the relevant plan provisions.

Further, we must bear in mind that because these documents are redacted by employers and insurers they have the opportunity to clearly make their intention known through unequivocal and categorical language. *See, Giannone v. Metro. Life Ins. Co.,* 311 F.Supp.2d 168, 174 (D.Mass.2004) ("Despite the holding of *Firestone Tire,* plan sponsors have been unaccountably loath to amend their plans to make the delegation of discretionary authority unambiguously explicit.").

Based on the foregoing, we find that Prudential has failed to meet its burden of establishing that the relevant Plan provisions allow for its discretion as provided for in *Firestone.* Accordingly, the Court will apply a *de novo* standard of review to its denial of plaintiff's LTD benefits.

## THE DECISION TO TERMINATE PLAINTIFF'S BENEFITS

### The Evidence

■ Prudential's decision to terminate Plaintiff's long term disability benefits under the LTD Plan and the Policy was based on its conclusion that Plaintiff was not totally disabled to perform the duties of any job of a sedentary nature with restrictions. Upon review of the evidence in the administrative record the Court finds Prudential's conclusion is the correct one.

Plaintiff had to meet the definition of "totally disabled" in order to be entitled to continued long term disability benefits under the LTD Plan and the Policy. "Totally Disabled" is defined as follows:

An Employee is totally disabled for the purposes of this Coverage only while satisfying both of the following requirements:

(1) Due to sickness or accidental bodily injury, he (a) is completely unable to perform any and every duty pertaining to his occupation with the Employer; and (b) after the Initial Duration... [12 months] of a period of disability, is completely unable to engage in any and every gainful occupation for which he is reasonably fitted by education, training or experience.

As previously discussed, a person would initially be considered totally disabled under the LTD Plan and Policy if he or she was unable to perform the duties of his or her own occupation with the Employer. However, after the Initial Period of one year, a person would only be considered totally disabled if he or she were unable to perform the duties of any job or occupation for which he is reasonably fitted by education, training or experience. The parties do not dispute that, at the time Plaintiff filed her long term disability benefits claim, she was totally disabled to perform the duties of her own occupation. The parties also agree that, immediately after the Initial Duration of disability, i.e., in 1996, Plaintiff was totally disabled from performing the duties of any job or occupation as required by the LTD Plan and Policy. However, upon a second routine review of Plaintiff's claim, Prudential

found that, beginning on August 1997, Plaintiff stopped meeting the definition of "Totally Disabled". Based on the medical records contained in the claim file, Plaintiff was found to be able to perform the duties of any job of a sedentary nature with some restrictions.

Thus, beginning in August 1998, Prudential terminated Plaintiff's long term disability benefits. Such decision was confirmed by Prudential on three different occasions after Plaintiff requested three different reconsiderations.

Prudential's decision to terminate Plaintiff's benefits under the LTD Plan and Policy was based on, and supported by, the medical evidence contained in Plaintiff's administrative record. Moreover, such determination—and the confirmation of the same in three different appeals—was taken after thorough evaluations (on four different occasions) of all the medical evidence contained in Plaintiff's file as supplemented from time to time by the Plaintiff herself during her appeals. All the medical evidence was considered, evaluated and analyzed by Prudential and by Dr. Gale Brown, the Certified Independent Medical Examiner who, at the request of Prudential, reviewed Plaintiff's file. These evaluations demonstrated that Plaintiff was not totally disabled from performing the duties of any sedentary job with restrictions for above-shoulder work.

Prudential's original and subsequent determinations to deny benefits are based on the following evidence:

1. Two of Plaintiff's treating physicians—Dr. Mundo and Dr. Cases Mayoral, provided contradicting medical opinions. Dr. Mundo stated in his letter dated August 13, 1996, that, in his opinion, Plaintiff was totally disabled for any job. However, Dr. Cases' opinion, as stated in March 14, 1996, was to the contrary. Dr. Cases' recommendation to Plaintiff was that she should avoid moderate or strenuous work, suggesting, if not asserting, that Plaintiff was capable of performing sedentary type work.

2. A Functional Capacity Evaluation performed by Dr. Rafael Seín in September 1997 demonstrated that Plaintiff had a workday tolerance of eight (8) hours. The evidence demonstrates that within those eight hours, Plaintiff had tolerance to sit for four hours, stand for two hours, and walk for four hours. Plaintiff had the ability to bend/stoop, squat, climb stairs, crouch occasionally (up to 2.5 hours), and occasionally could do weight lifting activities (between 4.5 to 15.5 pounds bilaterally, with the exception of above shoulder lifting which could not be assessed). The evidence further demonstrates that Plaintiff also had the ability to occasionally do the following activities: (a) use right foot; (b) right hand-simple grasping; (c) left hand-simple grasping; (d) both hands firm grasping, (e) both hands fine grasping; and (f) perform tasks that require static neck flexion and rotation, as well as do fifteen minutes of repetitive activities, and twenty minutes per session of keyboard activities. The Court finds that the FCE unequivocally showed that Plaintiff had the ability to perform any job of a sedentary nature, with restrictions.

3. Dr. Gale Brown's review of Plaintiff's medical records contains a thorough analysis of the medical evidence available at that time regarding Plaintiff's conditions. After conducting the evaluation, Dr. Brown concluded that there was no objec-

tive basis to restrict the claimant in performing the essential job duties associated with any sedentary occupation, with restrictions on over the shoulder right arm work and static use of arms in an extended outreached position.

4. Medical opinions from Plaintiff's attending physicians (medical report by Dr. Miguel Berríos García, dated November 30, 1998, and medical report by Dr. Héctor Cases Mayoral (neurological evaluation), dated December 9, 1998), which were submitted during her first appeal, contradicted each other. Dr. Berríos' opinion was that Plaintiff was totally disabled to perform any job. However, Dr. Cases once again indicated that Plaintiff should not do any moderate or strenuous work, suggesting that she can do sedentary work. Dr. Cases also mentioned that she cannot lift more than 10–15 pounds, which means that she can, at least, lift up to 10 pounds. Dr. Cases did mention that Plaintiff had some limitations, but, overall, his opinion is consistent with ability to do sedentary type work, with some restrictions.

5. The following reports from diagnostic tests support Prudential's conclusion: [8]

- Normal Cervical Spine CT Scan done on March 19, 1993;

- Normal Median Nerve SSEP done on April 27, 1995;

- Normal EEG study done on July 14, 1995;

- Negative Doppler Study of the upper extremities done on May 27, 1994; and

- EMG/NCS study done on February 5, 1997 which was normal in both upper extremities.

6. The following reports from diagnostic tests, some of which were submitted by Plaintiff during her second appeal, while others were already on the administrative record, support Prudential's conclusion:

- Dorsal spine x-rays 5/28/96: mild spondylotic changes and mid-dorsal levoscoliosis, otherwise normal;

- Lumbosacral spine x-rays;

- Electrodiagnostic test report 2/5/97: normal nerve conduction velocities in both upper extremities, normal F-waves in both upper extremities, normal right arm EMG;

- Upper extremity angiogram report, 9/19/95: Normal with no change in the subclavian arterial lumen with maneuvers and normal vascular anatomy;

- ENG report, 1/30/95: Normal; and

- Electrodiagnostic test report, 3/11/99: calcifications of the supraspinatus with retraction of the proximal portion of the supraspinatus muscle apparently on the basis of previous muscular tear.

7. Dr. Brown's Medical File Review Addendum Report, dated May 19, 1999, prepared after evaluating the entire administrative record, including translated Spanish medical records and the medical evidence Plaintiff submitted after Dr. Brown prepared his first Medical Review supports Prudential's conclusion.

---

8. When Dr. Brown evaluated the results of these tests on his Medical File Review, he determined that there was no electrodiagnostic evidence that would confirm a diagnosis of thoracic outlet syndrome, carpal tunnel syndrome or ongoing cervical radiculopathy.

Dr. Brown found that there was sufficient new objective medical evidence to support additional diagnoses of calcific tendonitis of the right shoulder, and paraspinal muscular spasm of the cervical and lumbar regions. However, he indicated that there still was no objective medical evidence that would support findings of median nerve entrapment at the wrists associated with carpal tunnel syndrome, vascular thoracic outlet syndrome, clinically significant bilateral carpal tunnel syndrome, and no objective neurologic evidence to substantiate a diagnosis of peripheral vertigo. Finally, he noted that Dr. Berríos and Dr. Mundo documented a physical capacity consistent with sedentary work with restrictions on Residual Physical Functional Capacity Assessments dated March 8, 1999, and May 5, 1999, respectively. Dr. Brown also mentioned that the Residual Physical Functional Capacity performed by Dr. Berríos rendered results that contradicted his own opinion expressed on November 30, 1998.

Dr. Brown confirmed his prior opinion that Plaintiff could perform any sedentary type job with restrictions on over shoulder right arm work, static use of the arms in an extended outreached position, proper ergonomic set up to avoid postural stressors, and positional changes as needed.

8. Dr. Berríos' physical functional capacity assessment dated March 8, 1999, where it is recommended only occasional lifting and/or carrying less than 10 pounds, standing and/or walking less than 2 hours in an 8 hour work-day, position changes as needed while sitting, and a limited pushing/pulling capacity for both upper and lower extremities.

9. Dr. Mundo's physical functional capacity assessment dated May 5, 1999, where the same restrictions mentioned in number 8 above, as well as some restrictions with respect to environmental exposures.

10. ENG report (January 30, 1995), upper extremity angiogram report (September 1, 1995), and audiology evaluation (January 19, 1996), which were all within normal limits, and did not reveal any significant findings regarding Plaintiff's balance or vascular anatomy.

11. Dorsal spine x-rays taken on May 28, 1996, showing only mild spondylotic changes, and an electrodiagnostic test results from February 5, 1997, that reveal normal nerve conduction velocities in both upper extremities.

12. Electrodiagnostic test results from March 11, 1999, that again indicate normal nerve conduction, as well as possible cervical radiculopathy without nerve involvement.

13. The following medical evidence submitted by Plaintiff during her final appeal:

● Medical notes from Dr. Seín dating intermittently from February 11, 1999 to July 9, 1999. On these notes, Dr. Seín indicates that Plaintiff's recent cervical spine x-rays were normal (February 11, 1999). The additional medical notes state that Plaintiff had a right-sided cervical radiculopathy at C7, and document Plaintiff's discomfort.

● Normal cervical spine films (3/9/99).

● A right shoulder sonogram (3/10/99) which revealed a "faint" calcification of the muscle.

- Electromyography test dated March 11, 1999, which indicated normal nerve conduction and possible cervical radiculopathy without nerve involvement.
- An MRI of the right shoulder, date April 29, 1999, which showed mild degenerative changes, and minimal bursitis versus tendinopathy.

Prudential concluded that these additional test results did not document an impairment which would prevent Plaintiff from performing an occupation with restrictions, i.e., not totally disabled to perform any job of a sedentary nature (such as clerical work) with restrictions. In reaching its conclusion Prudential examined not only Dr. Brown's medical opinion, but also the medical reports submitted by Plaintiff's own attending physicians, the diagnostic tests performed on Plaintiff, and the Functional Capacity Assessment performed by Dr. Seín in September 1997.

Our own examination of the administrative record before us likewise leads us to conclude that the evidence supports a finding that Plaintiff was not totally disabled under the terms of the LTD Plan and the Policy. The LTD Plan and Policy required Plaintiff to be totally disabled from performing the duties of any job for which she is reasonably fitted by education, training or experience. Several doctors, including Dr. Brown, Dr. Seín, and Plaintiff's own physician Dr. Cases, opined that she could do sedentary work, with restrictions. Plaintiff had a college education which provided her with sufficient skills to do any clerical or other sedentary work. The FCE unequivocally demonstrated that she was capable of enduring an 8–hour work day, with some restrictions. Given Plaintiff' ability to perform clerical or any other type of sedentary work, with some restrictions, and considering her college education and past professional experiences, we agree that Plaintiff is fitted and able to perform any clerical or otherwise sedentary job.

## Residual Functional Capacity and Vocational Factors

■ Plaintiff argues that Prudential failed to make an adequate residual functional capacity assessment, taking into consideration the opinions of Plaintiff's treating physicians[9] and to evaluate the vocational factors that allegedly showed that Plaintiff was unable to perform any type of employment in the national economy.[10] These two criteria are required ele-

---

**9.** Albeit it was not required to do so, Prudential did conduct a functional capacity assessment of Plaintiff's condition which took into consideration the opinions of Plaintiff's treating physicians. As previously discussed, in September 1997 Prudential requested Plaintiff to undergo a five-hour Functional Capacity Assessment with Dr. Rafael Seín, a Physiatrist. The FCE demonstrated that Plaintiff had the ability to work an 8–hour work day in a sedentary job with certain restrictions. In preparing his FCE evaluation, Dr. Seín even reviewed Plaintiff's medical records from her own treating physicians. Additionally, in reviewing Plaintiff's claim, Prudential took into consideration the Residual Functional Capacity Evaluations performed by three of Plaintiff's treating physicians. These were all consistent with the FCE's conclusions: that

Plaintiff can work any job of a sedentary nature with restrictions.

**10.** There is no requirement under the Policy provisions that a physician or other person ascertain which particular positions are appropriate for a disability benefits claimant to fill. Similarly, *Pari–Fasano*, 230 F.3d at 420 ruled:

> Granted, no physician or other person proceeded to speculate or investigate and report on actual particular positions that would be appropriate for appellant to fill, but in light of the medical evidence and the conclusions of the reviewing physicians such a job-specific laundry list hardly seems necessary. Under these circumstances, we are unwilling to require the insurance company to do more than it did in this case. . . .

ments for Social Security disability benefits claim.

A finding of disability under the Social Security Act is not controlling evidence in a determination of disability benefits under an insured long term disability plan, *Gannon,* 360 F.3d at 215 "except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." *Lopes,* 332 F.3d at 6 n. 9 (citing *Pari–Fasano,* 230 F.3d at 420).

Plaintiff has failed to establish the applicability of these provisions to a determination of long term disability benefits under the LTD Plan and the LTD Policy at issue in this case. Hence, entitlement to long term disability benefits under the LTD Plan and the Policy must be assessed exclusively under the terms of those two controlling documents, and not by the criteria established to determine Social Security disability benefits.

Based on the foregoing, Plaintiff's arguments regarding the residual functional capacity and vocational assessments are without merit.

### Treating Physicians

■ Plaintiff further argues that the opinions of her treating physicians should be given additional weight because they are in a better position to assess her limitations. However, "ERISA does not require plan administrators or reviewing courts to accord special deference to the opinions of treating physicians." *Gannon,* 360 F.3d at 215. *See also, McLaughlin,* 319 F.Supp.2d at 126 (no requirement that

plan administrator defer to claimant's treating physician); *Giannone,* 311 F.Supp.2d at 177 (no requirement that decision be based on opinions of claimant's physicians).

Accordingly, we conclude that Prudential did not err in its decision to terminate Plaintiff's benefits under the Policy.

### CONCLUSION

Based on the foregoing, Prudential Insurance Company of America's, Motion for Summary Judgment (docket No. **60**) is **GRANTED**[11] and the complaint filed in this case is hereby **DISMISSED.**[12]

Judgment shall be entered accordingly.

IT IS SO ORDERED.

### *JUDGMENT*

The court having dismissed the complaint filed in this case through its Order issued on this date,

It is hereby ORDERED AND ADJUDGED that the complaint filed in this case be and the same is hereby **DISMISSED.**

IT IS SO ORDERED.

---

11. *See also,* Plaintiff's Opposition (docket No. **61**), Prudential's Reply (docket No. **62**) and Plaintiff's Sur–Reply (docket No. **63**).

12. Prudential's Motion pursuant to [former] Local Rule 108.1 (docket No. **59**) is **GRANTED**. Accordingly, leave is granted to submit exhibits in Spanish. However, the parties are admonished that these documents must be

translated in the event of an appeal. *See, Ramos–Baez v. Bossolo–Lopez,* 240 F.3d 92, 94 (1st Cir.2001) ("Court may not consider non-English documents unless a translation is provided."); *see also,* 1st Cir. R. 30(d) ("The court will not receive documents not in the English language unless translations are furnished.").